# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7399 | **DATE** | 6/29/2001 |
| **CASE TITLE** | Nina Fay vs. Larry G. Massanari | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Accordingly, both sides' motions for a disposition summary judgment are denied, (11-1) but Nina Fay's alternative motion for remand is granted. (2-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | JUL 0 2 2001 | | |
| | Notified counsel by telephone. | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | 16 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| SN | courtroom deputy's initials | FILED FOR DOCKETING 01 JUN 29 PM 3: 36 | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

NINA FAY, surviving parent of        )
THOMAS FAY, deceased,                )
SSN_____                  )
                                     )
                Plaintiff,           )
                                     )
        v.                           )    No.  00 C 7399
                                     )                   DOCKETED
LARRY G. MASSANARI, Acting           )
Commissioner of Social Security      )           JUL 0 2 2001
Administration,                      )
                                     )
                Defendant.           )

## MEMORANDUM OPINION AND ORDER

Nina Fay, on behalf of her deceased son Thomas Fay ("Fay"),
seeks judicial review of a final decision of Commissioner of
Social Security Larry Massanari ("Commissioner") that denied
Fay's applications for Title II Disability Insurance Benefits and
Title XVI Supplemental Security Income under the Social Security
Act ("Act"), 42 U.S.C. §§423(d), 1382c.[1]  Nina Fay's current
motion for summary judgment under Fed. R. Civ. P. ("Rule") 56
asks for alternative relief:  either (1) the reversal of
Commissioner's decision and an award of benefits dating from the
onset of her son's alleged disability to the date of his death on
September 12, 2000 (three months before his 56th birthday) or
(2) a reversal and remand for further proceedings.  Commissioner

_____

    [1]  All further statutory references will take the form
"Section--," using the Title 42 numbering rather than the Act's
internal numbering.  All portions of 20 C.F.R. will be cited
"Reg. §--."  Citations to the administrative record will take the
form "R.--."  Finally, Social Security Rulings are cited "SSR--,"

has filed a cross-motion for summary judgment seeking affirmance of the decision. For the reasons set out in this memorandum opinion and order, both motions for a dispositive summary judgment are denied, but Nina Fay's motion for remand is granted.

## Procedural Background

Fay filed an application for supplemental security income on May 1, 1995, asserting that he had become disabled on March 27, 1994 as a result of (1) broken bones in his right leg that had not healed and (2) his diabetes (R. 68, 86). That application was denied both initially and upon reconsideration (R. 71-74, 78-80). Fay then filed a second application asking for a period of disability, disability insurance benefits and supplemental security income on May 20, 1997 (R. 173). That second application was also denied both initially and upon reconsideration (R. 161-164, 166-168). At that time Fay requested a hearing, a request that was granted and resulted in the "Hearing" held on May 21, 1998 before Administrative Law Judge ("ALJ") John Mondi.

On August 28, 1998 ALJ Mondi issued an opinion denying Fay's request for disability benefits, finding that although Fay's impairments were severe and he was incapable of performing his past relevant work, he was not disabled because he was able to perform a significant number of other jobs in the national economy (R. 20-21). ALJ Mondi's decision became final when the Appeals Council denied Fay's request for review on September 22,

2000 (R. 7-8). Thereafter Nina Fay, as Fay's surviving parent,[2] filed this action for review of the Agency's final decision pursuant to Section 405(g).

## Medical Evidence

Fay, who had been diagnosed with diabetes when he was 12, was involved in a motorcycle accident on April 2, 1994 that caused the fracture of his right tibia and right fibula (R. 111). As a result of the fractures, two steel rods were inserted into Fay's lower right leg (R. 114).

In response to a request by the Social Security Administration ("SSA"), Dr. Karim Valika completed a medical assessment report regarding Fay on June 6, 1995. That report simply notes that Fay then had insulin dependent diabetes mellitus, that his compliance with his prescribed therapy for that condition was poor and that he had fractured his right tibia and right fibula in a motorcycle accident (R. 128).

Fay was then examined by Dr. Daksha Mehta on July 27, 1995 (R. 129). At that time Dr. Mehta noted that Fay had "significant difficulty in walking" and could not stand on his right leg, that Fay's right leg appeared to be 2 inches shorter than his left, that there was a deformity on the lower half of the right leg with significant bulging of the bone and that Fay limped on his right leg (R. 129-30). Dr. Mehta later confirmed, based on her

---

[2] Nothing in the record indicates the cause of Fay's death.

3

observations of Fay, that he could walk 50 feet without a cane.

Dr. Nicholas I. Gemell, who conducted a followup examination the same day, found upon review of x-rays taken of Fay's lower right leg that the fracture "seems to have well advanced into the healing stage" (R. 131). But Dr. Gemell also remarked "a rather marked degree of periosteal callous" (bulging of the bone) at the fracture site (id.).

There is then a 1-1/2 year gap in the medical evidence, with the next record reference to Fay's leg being the report of an April 11, 1997 exam conducted by Dr. Gemell (R. 253). At that time he concluded that the fracture was "more or less" completely healed, but he observed a certain degree of "bowing" that he had not noticed in his July 1995 exam (id.).

Fay was referred by SSA to Dr. Rochelle Hawkins for an internal medicine evaluation on June 30, 1997. Dr. Hawkins also noted some bowing, swelling and tenderness in Fay's lower right leg (R. 274-75). She further observed a "slight limp" favoring the right lower extremity and a "toeing in" of Fay's gait (R. 274).

Fay was next reexamined by Dr. Mehta on October 2, 1997. Dr. Mehta repeated her earlier observation of "a slight bowing of the right leg laterally," and she described Fay's limp as "significant" (R. 285-86).

Another nine months passed without further medical evidence.

Then on July 9, 1998 the rods in Fay's right leg were replaced because they were infected, displaced superiorly and causing right knee pain (R. 367).

During the same extended time period Fay was also experiencing difficulties caused by his diabetes. Fay was taken to an emergency room due to acute hypoglycemia on September 20, 1994, March 20, 1995, December 3, 1995, December 13, 1995 and September 24, 1996 (R. 119, 122, 144, 149, 362). During a one-week period in November 1997 Fay went to the hospital three times complaining of vomiting and abdominal pain, which the doctors attributed to diabetic gastroparesis and hyperglycemia (R. 333, 347). On August 17, 1997 Fay had suffered from gastroenteritis that may also have been related to his diabetes (R. 355).

Finally, various non-examining physicians completed Residual Physical Functional Capacity ("RFC"[3]) Assessments for Fay during the time period from August 1995 to October 1997. Dr. J.L. Gonzales' August 27, 1995 report opined that Fay should be able to lift 20 pounds occasionally and 10 pounds frequently, to stand for 2 hours out of an 8 hour work day and to sit for 2 out of 8 hours. Dr. W.B. Donnelly's July 21, 1996 RFC report came to similar conclusions, but it added that Fay could not operate repetitive foot controls with his right leg (R. 152) and stated that his level of pain should not prevent him from doing

---

[3] See n.5.

sedentary work (R. 156).

Dr. Gonzales again completed a RFC Assessment on July 15, 1997. That report concluded that Fay could lift 20 pounds occasionally and 10 pounds frequently and could stand for 6 hours out of 8 an hour work day and sit for 6 out of 8 hours. Another RFC Assessment completed on October 24, 1997 by Dr. Robert T. Patey came to the same conclusions.

## Hearing Testimony

At the Hearing ALJ Mondi heard testimony from three individuals: Fay, his live-in girlfriend of two years Janet Ikert ("Ikert") and vocational expert Cheryl Horseth ("Horseth"). What follows sets out the testimony of each witness.

Fay testified that he had a tenth grade education but was functionally illiterate (R. 34). After his motorcycle accident he held a job with Butell Builder doing fire restoration work (R. 35). According to Fay, he was required to leave that job because his "diabetes was too out of control" with "[l]ow blood sugar[ ]" episodes (R. 36). Fay further testified that he took three types of insulin for his diabetes and had slight damage to his eyes as a result of that disease (R. 38-39). Fay also stated that he was not eligible to have an Illinois driver's license because of his diabetes (R. 45).

Regarding the injury to his leg, Fay testified that his right leg was 4 cm. shorter than his left leg and that his left

6

hip was deteriorating and causing him pain from carrying all of his weight (R. 39). At that time Fay had been told that he needed further surgery on his right leg (R. 43). Fay asserted that due to those leg problems he believed he could only walk one-half to one block, could only stand for 5 minutes and had difficulty sitting in one place for too long, but he believed he could probably lift up to 50 pounds (R. 39-41).[4] As for his daily activities, Fay stated that he occasionally did chores such as dishes and laundry and mowed the lawn with a power mower, although he said that mowing the lawn was dangerous for him because it caused his blood sugar level to drop (R. 44).

As for Ikert, she described incidents in which she would wake up in the middle of the night and find Fay with blood sugar levels as low as 38 (the normal range is 80-150) (R. 48). Ikert testified that Fay's blood sugar dropped into the 40s or lower 6 to 8 times a week and that at such times he could be incoherent and unable to tell who she was, and he sometimes became physically belligerent (R. 50-51). Ikert also testified that she was present when Fay took his insulin shots in the morning, afternoon and at night (R. 50) and that she was trying to follow

---

[4] That last component is iffy at best, for the question to Fay and his answer read this way (R. 41):

Q. And how about [lifting] 50 pounds?

A. To lift it is one thing but to lift and do something with it is something else.

7

the instructions of the doctors at Cook County hospital by fixing Fay "full" dinners with meat, potatoes, rice and vegetables in order to stabilize his blood sugar levels (R. 56).

As for her observations of Fay's ability to walk and stand, Ikert said that Fay went grocery shopping with her (R. 57). On those occasions Fay used the grocery cart to adjust his weight and started to limp almost immediately (id.). These shopping trips lasted 20 to 25 minutes, and Ikert opined that Fay would not have been able to stand and walk for that length of time without the aid of the cart (R. 58). Finally Ikert expressed her understanding that Fay would need six months to one year to recover from his upcoming leg surgery.

Finally, the ALJ heard from vocational expert Horseth. Based on her review of the record, Horseth had concluded that Fay could not do his past work as a construction laborer, yardman, mover or machine operator but that he could perform other jobs such as cashier, assembler, hand packager, stock clerk or shipping and receiving clerk, although the latter of those might be precluded if in fact Fay was unable to read or write with any proficiency.

ALJ Mondi then asked Horseth if her opinion would be different if the testimony of Fay and Ikert were to be accepted as an accurate description of Fay's capabilities and limitations. Horseth responded that both individuals had testified to many

problems, each of which would alone preclude work: Fay's inability to stand for more than 5 minutes, his upcoming surgery and recovery time, the frequency and duration of his "emergency episodes" (a reference to his bouts with hypoglycemia) and the physical belligerence caused by those episodes (R. 64-65).

## Legal Standard

Fay must have suffered from a disability to be eligible for each of his claims for benefits. Because of Fay's death, with his claim being pursued by his surviving parent, only his claim for disability insurance benefits is now at issue. That is so because under Reg. §416.542(b)(4) underpayments of supplemental security income benefits may be made to a surviving parent only for months of eligibility during which the deceased underpaid recipient was a child. And because Fay was not of course a child from the alleged onset date until his death (see Reg. §416.1856), Nina Fay cannot recover any supplemental security income benefits to which he may have been entitled during that period.[5]

"Disability" is defined in pertinent part as the inability (Section 423(d)(1)(A)):

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

---

[5] Commissioner does not dispute, however, that Nina Fay may recover any disability insurance benefits to which her son may have been entitled.

Zurawski v. Halter, 245 F.3d 881, 885 (7th Cir. 2001)(internal

citations, quotation marks and brackets omitted) most recently

reiterated the customary five-step inquiry prescribed by Reg.

§404.1520 to determine whether that standard has been met:

> (1) whether the claimant is currently unemployed; (2)
> whether the claimant has a severe impairment; (3) whether
> the claimant's impairment meets or equals one of the
> impairments listed by the Commissioner, see 20 C.F.R. §404,
> Subpt. P, App. 1; (4) whether the claimant can perform his
> past relevant work; and (5) whether the claimant is capable
> of performing work in the national economy.  Under the five-
> part sequential evaluation process, an affirmative answer
> leads either to the next step, or, on Steps 3 and 5, to a
> finding that the claimant is disabled.  A negative answer at
> any point, other than Step 3, ends the inquiry and leads to
> a determination that a claimant is not disabled.  If a
> claimant reaches step 5, the burden shifts to the ALJ to
> establish that the claimant is capable of performing work in
> the national economy.

As for this Court's review of the ALJ's determination, Estok

v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998) exemplifies the

multitude of cases teaching that judicial review of an ALJ's

factual determinations is limited to whether they were supported

by substantial evidence in the record.  "Substantial evidence" is

consistently defined as "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion"

(Richardson v. Perales, 402 U.S. 389, 401 (1971)).  And while

this Court reviews the whole administrative record, it "does not

substitute its judgment for that of the Commissioner [or ALJ] by

reconsidering facts, reweighing evidence, resolving conflicts in

evidence, or deciding questions of credibility" (Estok, 152 F.3d

at 638).

Nonetheless a court "cannot uphold a decision by an administrative agency...if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result" (Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996)). Finally, in contrast to the "substantial evidence" standard applicable to factual determinations, the ALJ's legal conclusions are reviewed de novo (see, e.g., Dotson v. Shalala, 1 F.3d 571, 575 (7th Cir. 1993)).

## ALJ Mondi's Decision

ALJ Mondi first found that Fay met the disability insured status requirements under Title II of the Act only through June 30, 1997. Next he went through the five-step inquiry set out above. First he found that while Fay performed some work after his alleged onset date, that work was not "substantial gainful activity." Then the ALJ determined that although Fay's impairments did produce "severe" limitations, no impairment or combination of impairments met or equaled in severity any of the specific impairments listed in Reg. §404, Subpt. P App. 1. Further the ALJ found that Fay was unable to perform his past relevant work as a laborer. Finally he found that Fay's RFC[6]

---

[6]  "Residual functional capacity" is how much an adult can do despite his impairment (Zurawski, 245 F.3d at 886 n.5).

allowed him to perform the physical exertion requirements for light work (work that requires maximum lifting of 20 pounds and frequent lifting of 10 pounds).

In making his determinations, ALJ Mondi found that Fay's allegations of disabling symptoms and limitations were not credible. And based on Fay's RFC, age and education and the testimony of the vocational expert, the ALJ concluded that under Medical-Vocational Rule 202.17 Fay was "not disabled."

### Fay's Credibility

Nina Fay contends that ALJ Mondi erred in finding Fay's testimony not credible. Courts will not disturb an ALJ's credibility determination unless it is "patently wrong" (Zurawski, 245 F.3d at 887). But that deference is not absolute (Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000), quoting Herron v. Shalala, 19 F.3d 329, 335 (7th Cir. 1994)):

> Although an ALJ's credibility determination is usually entitled to deference, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision."

Furthermore, as this Court said in Aidinovski v. Apfel, 27 F.Supp.2d 1097, 1102-03 (N.D. Ill. 1998):

> [B]oth administrative regulations and case law require ALJs to explicate their reasoning fully, precluding them from rejecting evidence favorable to the claimant without explaining (within reason) why they have done so.

ALJ Mondi asserted as to Fay's testimony (R. 19):

> Testimony by the claimant as to symptoms and their
> functional affects [sic], when evaluated using the
> criteria of SSR 96-7p, was not credible in establishing
> disabling limitations for any 12-month period because
> such limitations were inconsistent with the objective
> findings, the claimant's use of medications, and even
> his current daily activities, which included cutting
> the grass with a power mower.

That conclusory statement that Fay's testimony was "inconsistent

with the objective findings" simply does not "build an accurate

and logical bridge between the evidence and the result" (Sarchet,

78 F.3d at 307). Not only did ALJ Mondi fail to explain how the

objective medical evidence contradicted Fay's assessment of his

symptoms and their effects, but he also failed to address the

objective medical evidence and Ikert's corroborative testimony,

both of which supported Fay's subjective complaints.

In the former regard, the objective medical record reveals

that Fay's right leg was two inches shorter than his left, that

his lower right leg was bowed laterally and swollen and that the

metal rods were later replaced because they were displaced and

infected. That is more than ample evidence of an impairment that

could reasonably be expected to produce the pain and other

symptoms and limitations of which Fay complained. So ALJ Mondi

could not disregard Fay's testimony entirely without addressing

that evidence (see Reg. §416.929).

In the latter regard, the ALJ's credibility determination

also failed to address at all Ikert's testimony, which

13

corroborated Fay's assessment of his symptoms and limitations as well. SSR 96-7p teaches that an adjudicator must consider any statements by the individual "and other persons" concerning the individual's symptoms and their functional effects. Ikert gave extensive testimony on that score, and ALJ Mondi could not ignore that line of evidence entirely.[7]

In sum, it is not at all clear from ALJ Mondi's decision whether he examined the evidence that supported Fay's testimony as well as any evidence suggesting his testimony was not credible. That alone warrants remand (see Zurawski, 245 F.3d at 888).[8]

---

[7] It should also be noted that Ikert's testimony was not "essentially redundant" of Fay's testimony (contrast Books v. Chater, 91 F.3d 972, 980 (7th Cir. 1996)). Ikert gave more detailed testimony about Fay's hypoglycemic episodes and his ability to walk, and she relayed more information about what they had learned from the doctors at Cook County Hospital regarding Fay's impending surgery.

[8] Moreover, Fay's occasional ability to assist in household chores such as doing the dishes and laundry, and the fact that he cut the grass with a power mower, are not really substantial evidence that his testimony was incredible. Our Court of Appeals has repeatedly pointed out that minimal daily activities such as household chores do not establish that a person is capable of engaging in substantial physical activity (see Clifford, 227 F.3d at 870). Moreover, Fay testified that mowing the lawn was in fact a dangerous activity for him because it caused his blood sugar to drop. And there is no indication that Fay walked farther than a half block or stood for more than 5 minutes while mowing the lawn. Finally, Ikert's testimony that Fay was able to accompany her grocery shopping because he could use the cart for support suggests that Fay might be able to mow the lawn because he could use the power mower to assist him in carrying his weight. Similarly, Fay's use of medications does not substantially undermine his credibility. Fay used three types of

Nina Fay also argues that ALJ Mondi made numerous errors in deciding that Fay was not totally disabled. Once the ALJ determined that Fay had no past relevant work, a finding of no disability would depend on a further determination that Fay nevertheless had the capability to perform some work in the national economy (Clifford, 227 F.3d at 873). Hence ALJ Mondi's determination that Fay was capable of performing light work must be supported by substantial evidence in the record (id.).

In contesting that determination, Nina Fay argues that in making that finding the ALJ again incorrectly cited medical evidence and disregarded evidence contrary to his conclusion. On that score Zurawski, 245 F.3d at 888 is again instructive:

> It is worth repeating that "an ALJ may not ignore an entire line of evidence that is contrary to her findings," Henderson v. Apfel, 179 F.3d 507, 514 (7th Cir. 1999), rather she must "articulate at some minimum level [her] analysis of the evidence" to permit an informed review. Clifford, 227 F.3d at 872. Here (as noted above), the ALJ mentions only the medical evidence favoring the denial of benefits. And from her analysis, we are unable to discern whether she considered the record as a whole.

In this instance ALJ Mondi declined to consider the impact

---

insulin a day in an attempt to control his blood sugar levels. As for pain medication, Fay testified that he took about 14 aspirin tablets a day (R. 42). While there is no evidence that Fay was ever prescribed pain medication, it isn't clear from Fay's testimony that his inability to walk and stand for longer periods was due to the pain that such activity caused him, as opposed to a physical inability to do so because of the damage to his right leg.

of Fay's diabetes mellitus on his ability to work at all once the ALJ concluded that Fay's bouts with hypoglycemia were due to non-compliance.[9]  To be sure, noncompliance with a prescribed regime may be cause for a denial of benefits:  Reg. §404.1530(a) provides that "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."  But there are several problems with the ALJ's decision on that issue.

First, the exhibits that ALJ Mondi cites (Exs. 24F [incorrectly referred to as 24/2], 7F and 4F/7) en route to his assertion that Fay was noncompliant do not in fact support that conclusion.  Exs. 7F (R. 285-86) and 4F/7 (R. 268-70) say nothing at all about Fay's compliance or noncompliance with his prescribed treatment.[10]  Ex. 24F does say that Fay "did not take his insulin today nor did he eat this morning" (R. 355).  But at that time Fay was in the Sherman Hospital Emergency Department complaining of vomiting since the night before.  Such an incident surely does not even suggest that Fay was chronically non-compliant.  More importantly, the ALJ's decision fails to consider contrary evidence, such as Ikert's testimony that she

---

[9]  ALJ Mondi erroneously referred to those as bouts of hyperglycemia (R.20).

[10]  In fact, Ex. 4F/7 states that Fay "keeps good record of Acuchecks" (R. 268), which indicates that Fay regularly monitored his blood sugar levels as instructed.

16

regularly observed Fay take his insulin as prescribed and helped him monitor his blood sugar levels (R. 50).

Furthermore, as <u>Shramek v. Apfel</u>, 226 F.3d 809, 812 (7th Cir. 2000) recently quoted from <u>Rousey v. Heckler</u>, 771 F.2d 1065, 1069 (7th Cir. 1985):

> Essential to a denial of benefits pursuant to Section 404.1530 is a finding that if the claimant followed her prescribed treatment she could return to work.

Here ALJ Mondi made no finding that if Fay followed his prescribed diabetes treatment he could return to work, and there is no medical evidence in the record as to whether Fay's bouts with hypoglycemia were entirely (or even almost entirely) avoidable.

As for Fay's problems with his right leg, ALJ Mondi again miscited an exhibit and ignored evidence that was contrary to his finding that Fay's leg problems did not render him unable to work. While the ALJ did note the medical evidence from July 1995 reporting that Fay's right leg was 2 inches shorter than his left and was deformed by significant bulging of the bone and localized redness (R. 18), he ultimately determined that Fay could stand and walk long enough to be able to engage in light work (R. 20):

> While his foot problems appear to have recently worsened such that he underwent surgery to remove infected hardware on July 10, 1998, prior to this his walk was described as involving only a slight limp (Exhibit 7F). Further, there is no reason to conclude that the surgery was unsuccessful in restoring his ability to perform the standing and walking required by the jobs cited by the vocational expert.

17

Although Dr. Hawkins did describe Fay's limp as "slight" (in Ex. 5F), Ex. 7F--to which ALJ Mondi mistakenly cited--contained Dr. Mehta's description of the observed limp as "significant" (R. 286). ALJ Mondi simply ignored that evidence of the greater extent of Fay's limp, as well as other evidence that his leg injury was more severe, such as Dr. Mehta's July 27, 1997 observation that Fay "has deformity of his lower leg and has significant difficulty in walking. He cannot stand on his right leg." (R. 129). While the ALJ was entitled ultimately to accept evidence suggesting that Fay could walk and stand with less difficulty, rather than the contrary line of evidence, he could not do so without acknowledging that contrary evidence at all.

ALJ Mondi's statement that "there is no reason to conclude that the surgery was unsuccessful in restoring his ability to perform the walking and standing required" is particularly troublesome.[11] There was no evidence whatever in the record

---

[11] In that respect, it should be remembered that the walking-standing findings were made by medical reviewers who based their conclusions entirely on the medical records of others, not on their own first-hand diagnoses. And the medical records can be searched in vain for any direct diagnoses to support those quantified conclusions (standing or walking or both for 6 hours, and sitting for 6 hours, out of an 8 hour workday). It is distressing to find government counsel labeling the two paper-reading state agency consulting physicians as "very familiar with the condition of Mr. Fay's right leg" (Mem. 9-10) when nothing in the underlying evaluations really supported the necessary numerical evaluations, and then compounding that overstretch by saying "[t]hose opinions were uncontradicted" (Mem. 10) when the direct evidence was entirely at odds with those numbers.

before the ALJ about Fay's post-operative status, so that the quoted statement is entirely speculative. Indeed, the record evidence as to the effect of the surgery supports quite the opposite conclusion: Fay testified that he was told by the orthopedic doctors at Cook County Hospital that he would have to wear a leg brace for over a year after the surgery (R. 44), and Ikert likewise testified that she was present when Fay was told that it would take up to one year for him to recuperate after the surgery (R. 59). Finally on the issue of disability vel non, vocational expert Horseth opined that based on that testimony the surgery and recuperative time would preclude work (R. 64).

Once again, an ALJ is not of course required to address every piece of evidence or testimony (see <u>Zurawski</u>, 245 F.3d at 889). But here ALJ Mondi's complete failure to acknowledge expressly contrary lines of evidence also necessitates a remand for a redetermination of Fay's RFC.

### Fay's Final Application

Fay filed a third application for social security benefits that led to his being granted supplemental security income benefits effective May 1999. Nina Fay argues that because Fay's prior claim was still pending before the Appeals Council when his third application was filed, the new application should have been sent to the Appeals Council to see if it contained new and material evidence relating to the prior claim. Hence she also

seeks a remand on that basis.  Because this case is being remanded for a new hearing in any event, this opinion need not reach the issue whether the Appeals Council should have associated Fay's third application with his prior and still pending claim.

## Conclusion

ALJ Mondi's erroneous references to the record, his complete failure to articulate even minimally his reasons for rejecting contrary lines of evidence and his completely unfounded speculation as to the results of Fay's surgery necessitate a redetermination of the weight that should have been given to Fay's testimony and to Fay's FRC from the alleged onset date of his disability until his death.  Accordingly, both sides' motions for a disposition summary judgment are denied, but Nina Fay's alternative motion for remand is granted.[12]

Given the nature of the factors that have led to the remand, there is obviously room for concern as to returning the case for a new look by the same ALJ.[13]  Hence this Court urges

---

[12]  This is of course a "sentence four" remand under Section 405(g) and hence a final order within the scope of <u>Melkonyan v. Sullivan</u>, 501 U.S. 89, 97-102 (1991).

[13]  This opinion is being written just after a per curiam opinion from the Court of Appeals of the District of Columbia has reversed a District Judge in the <u>Microsoft</u> litigation on grounds of his manifested bias.  Though what is reflected in the record here does not of course even remotely begin to approach the type of egregious judicial (really nonjudicial) conduct disclosed there, the need for reassignment to a new judicial officer is not

Commissioner to exercise his discretion in favor of referring the case to a new ALJ because of the "legitimate and compelling reason[s]" disclosed here (see, e.g., <u>Travis v. Sullivan</u>, 985 F.2d 919, 924 (7th Cir. 1993)).

Milton I. Shadur
Senior United States District Judge

Date:   June 29, 2001

---

limited to situations in which the first judge's predilections are manifested in such an overt way--indeed, that is why "appearance of impropriety" rather than actual impropriety is made the standard for disqualification.  Here the reader is left with a sense of disquietude, and it would seem that should suffice to call for the new look suggested in the text.  Although the money at stake in <u>Microsoft</u> obviously dwarfs what is at issue in this case, the amount at issue here is of course just as important to a plaintiff of modest (if not meager) means.